**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JENNIFER A. FLECK, | ) | CASE NO. 5:15-CV-00316 |
| | ) | |
| Plaintiff, | ) | JUDGE ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Jennifer A. Fleck ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

her application for Period of Disability ("POD") and Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United

States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for

a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be AFFIRMED.

## I.    PROCEDURAL HISTORY

On May 10, 2011, Plaintiff filed her application for POD and DIB, alleging a

disability onset date of August 26, 2008.  (Transcript ("Tr.") 19.)  The application was

denied initially and upon reconsideration, and Plaintiff requested a hearing before an

administrative law judge ("ALJ").  (*Id.*)  On August 27, 2013, an ALJ held Plaintiff's

hearing.  (*Id.*)  Plaintiff participated in the hearing, was represented by counsel, and

testified.  (*Id.*)  A vocational expert ("VE") also participated and testified.  (*Id.*)  On

September 27, 2013, the ALJ found Plaintiff not disabled.  (Tr. 16.)  On December 24,

2014, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision

became the Commissioner's final decision.  (Tr. 1.)

On February 18, 2015, Plaintiff filed her complaint to challenge the

Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in

this case.  (Doc. Nos. 11, 16.)

Plaintiff asserts the following assignments of error: (1) The ALJ erred by failing to

consider the limitations caused by Plaintiff's migraine headaches and digestive

disorders in evaluating her residual functional capacity; and (2) the ALJ erred in finding

that Plaintiff did not meet Listing 5.00.

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Plaintiff was born in August 1978 and was 34-years-old on the date last insured.

(Tr. 30.)  She had at least a high school education and was able to communicate in

English.  (*Id.*)  She had past relevant work as an administrative clerk, a cashier, an

informal waitress, a restaurant manager, a health and safety instructor/community

health educator, an artist, and a still photographer.  (*Id.*)

### B.  Medical Evidence

#### 1.  Medical Reports

On March 24, 2008, Plaintiff complained of abdominal pain and underwent an

esophagogastroduodenoscopy (EGD). (Tr. 339-40.)  The test showed moderate to

severe gastritis (inflammation of the stomach lining) and ulcers. (Tr. 340.)  During

2

September and December of 2008, Plaintiff presented to the emergency room with complaints of vomiting and abdominal pain. (Tr. 330-32, 334-36.)  She was treated with anti-nausea medication and discharged home. (*Id.*)

In February 2009, Plaintiff continued to complain of nausea and abdominal pain. (Tr. 325.)  She underwent a second EGD, which showed chronic gastritis without erosive esophagitis. (Tr. 327-29.).  A February 2009 abdominal ultrasound was generally unremarkable for acute pathology. (Tr. 294.)

On July 26, 2009, Plaintiff sought emergency room care for dry heaving and nausea. (Tr. 316-17.)  Aside from abdominal tenderness, there were no significant abnormalities on examination. (*Id.*)  She was discharged in an improved condition after treatment. (*Id.*)

In February 2010, Plaintiff presented to the emergency room with complaints of nausea and vomiting, but there were no signs of "acute abdomen," or sudden, severe abdominal pain. (Tr. 271-72.)  After indicating she felt better, Plaintiff was released. (*Id.*)

Consultative surgeon Nathaniel Graham, M.D., evaluated Plaintiff on March 8, 2010. (Tr. 267-68.)  Dr. Graham recounted Plaintiff's history of abdominal pain, nausea, and vomiting over the past two to three years. (Tr. 267.)  Plaintiff reported that "for about a year since one of her bad attacks of nausea, she has not been able to tolerate dairy products." (*Id.*)  Plaintiff weighed 133 pounds and was five feet, four inches tall. (Tr. 268.)  A physical examination revealed a tender abdomen and a slightly enlarged liver. (*Id.*)  Dr. Graham ordered diagnostic testing in the form of an ultrasound of the abdomen, an "HIDA" scan, stool cultures, and hepatitis screening. (*Id.*)  The tests

3

returned negative for abnormalities. (Tr. 273-75, 284-85.)

Due to pain and acalculous cholecystitis, Dr. Graham performed a laparoscopic cholecystectomy, removing Plaintiff's gallbladder, on April 8, 2010. (Tr. 265-66.) Plaintiff tolerated the procedure well, but went to the emergency room the next day due to abdominal pain, epigastric burning, and vomiting. (Tr. 261-62.)  She was discharged in improved condition, with prescriptions for Zofran and Maslox, as needed. (Tr. 262.)

On August 11, 2010, Plaintiff complained of a decreased appetite, intermittent diarrhea, and nausea to Saira Ismail, M.D., her primary care physician. (Tr. 418.)  Upon physical examination, Plaintiff appeared well nourished and had no abdominal masses or tenderness. (*Id.*)  An August 18, 2010, treatment note from Dr. Ismail indicated that Plaintiff had abdominal pain, but a negative stool study, along with an EGD/colonoscopy revealing only mild gastritis. (Tr. 513.)  A CT scan of the head taken in August 2010 was normal. (Tr. 452.)

On February 16, 2011, Plaintiff complained of migraines to Dr. Ismail.  (Tr. 421.) In response, the physician increased her prescription of Topamax and prescribed Fiorinal, as needed. (*Id.*)

On March 18, 2011, Plaintiff treated with gastroenterologist Kevin Geraci, M.D., for "failure to thrive." (Tr. 375-77.)  She reported that she had lost 25 pounds and complained of headaches. (Tr. 375.)  Plaintiff weighed 115 pounds and a physical examination revealed no significant abnormalities. (Tr. 376.)  Dr. Geraci order a number of tests. (Tr. 377.)

An April 2011 CT scan of the head returned normal. (Tr. 386.)  On May 18, 2011, Plaintiff's esophagus examination and colonoscopy showed no abnormalities, while an

4

EDG revealed bile gastritis. (Tr. 402, 467-71.)  Dr. Geraci prescribed medication for

gastritis. (Tr. 402.)  During a follow up appointment in June 2011, Plaintiff continued to

complain of abdominal pain and nausea. (Tr. 378, 559.)  Dr. Geraci noted that a recent

CT scan of the abdomen and an ultrasound of the pelvis were normal. (*Id.*)

On July 1, 2011, Plaintiff presented to the emergency room with complaints of

nausea, vomiting, and abdominal pain. (Tr. 607.)  Care providers administered Zofran

and Phenergan, which significantly alleviated Plaintiff's symptoms. (Tr. 608.)  She was

discharged home the same day. (Tr. 609.)  On July 29, 2011, Plaintiff reported weight

loss and nausea to Dr. Geraci, but she no longer experienced diarrhea or abdominal

pain. (Tr. 558.)  She weighed 115 pounds. (*Id.*)  Her abdomen was tender over the right

lower quadrant, but there was no mass felt and no rebound or guarding. (*Id.*)  Dr.

Geraci increased Plaintiff's prescription of Zofran. (*Id.*)

In September and November 2011, Plaintiff went to the emergency room with

complaints of nausea and vomiting. (Tr. 587, 540-42.)  She experienced significant

improvement following the administration of antiemetics. (*Id.*)

On March 1, 2012, Plaintiff established medical care at Twinsburg Family Health

and reported nausea, vomiting, and abdominal pain. (Tr. 695.)  Despite taking

Topamax twice daily, Plaintiff said that her migraines were poorly controlled. (*Id.*).

Plaintiff weighed 103 pounds and her body mass index (BMI) was 17.83. (*Id.*)

On May 1, 2012, Plaintiff presented to gastroenterologist Steven Shay, M.D. (Tr.

765-67.)  Dr. Shay described Plaintiff's most dominant symptoms as an inability to eat

and recurring episodes of nausea and vomiting. (Tr. 765.)  Plaintiff described

5

intolerance to a range of foods and visits to the emergency room due to severe symptoms. (Tr. 765-66.)  She had not been to the emergency room in the past five months because of success with dietary restrictions. (Tr. 766.)  Plaintiff was taking Zofran daily for digestive issues. (*Id.*)  Dr. Shay noted that Plaintiff had a history of migraine headaches for which she previously took Imitrex and Tompamax, but had since had discontinued the medications. (*Id.*)  Later that month, Plaintiff underwent a gastric emptying study which showed what Dr. Shay described as "mild gastroparesis," a condition that reduces the stomach's ability to empty its contents. (Tr. 784.)  A June 2012 CT of Plaintiff's abdomen showed no active bowel inflammation. (Tr. 786.)

On May 2, 2012, neurologist Adham Jammoul, M.D., evaluated Plaintiff for possible migraine headaches. (Tr. 771-74.)  Plaintiff reported that she had headaches for many years, and in March 2012, they started to occur on a daily basis. (Tr. 771.)  She described two types of headaches: (1) chronic daily dully headaches and (2) throbbing severe migraine headaches that lasted up to one week in duration and occurred around two times each month. (*Id.*)  She experienced some relief by resting with the lights off and taking nine to 12 extra strength Tylenol tablets per day. (Tr. 771-72.)  Plaintiff reported that her primary care provider recently weaned her off of Topamax and that Imitrex provided no relief. (Tr. 772.)  Dr. Jammoul noted that Plaintiff had not vomited since November 2011, but was nevertheless taking Zofran daily. (*Id.*)  The results of Plaintiff's neurological examination that day were within normal limits. (Tr. 774.)  Given Plaintiff's multiple somatic complaints and history of substance abuse, Dr. Jammoul referred her to a chronic pain rehabilitation program. (*Id.*)  He prescribed a

medrol dosepak to prevent headaches. (*Id.*)

In May 2012, Plaintiff participated in a psychiatric pain management evaluation with Joan Jersan, R.N., C.N.S., for headaches and other pain symptoms. (Tr. 777-80.) Plaintiff reported a constant dull headache, along with migraine headaches one to two times a month that could last up to 14 days. (Tr. 777.)  Plaintiff was working on an online degree in fashion design, but was behind because she had failed a class due to migraines and fatigue. (Tr. 778.)  A physical examination showed Plaintiff weighed 104 pounds and had a normal gait. (Tr. 780.)  She reported pain with flexion and rotation of the neck and had multiple fibromyalgia tender points. (*Id.*). Nurse Jersan recommended a chronic pain rehabilitation program. (*Id.*)

Jason Tronetti, D.O., examined Plaintiff on October 26, 2012, and recorded her weight as 110 pounds and BMI as 18.90. (Tr. 678.)  Dr. Tronetti observed that Plaintiff was stable on Zofran. (Tr. 684.)  During a January 2013 office visit with Dr. Tronetti for sinus congestion and cough, Plaintiff weighed 112 pounds with a BMI of 19.20. (Tr. 690.)  She complained of headaches, but did not have issues with nausea or vomiting. (*Id.*)

In February 2013, Plaintiff returned to Twinsburg Family Practice reporting a severe migraine headache that had persisted for four days. (Tr. 873-74.)  She had been taking Tylenol which reduced, but did not alleviate, her pain. (*Id.*)  Jennifer Maluyao, M.D., prescribed Tramadol for only short-term use and recommended that Plaintiff return to the headache clinic. (*Id.*)

On March 12, 2013, Sheila Rubin, M.D., evaluated Plaintiff to treat her chronic

7

headaches and protracted episodic migraines. (Tr. 860-62.)  Plaintiff could not recall

the last time she was headache-free, but thought she may have had one or two days

without a headache during January or February. (Tr. 860.)  Her daily headache pain

ranged in severity from a "1 to 4" out of "10." (*Id.*)  Plaintiff's migraine frequency varied;

she had two migraines in March, but could go an entire month without one. (*Id.*).  For

her headaches and migraines, Plaintiff took extra strength Tylenol two to four times per

day. (*Id.*)  Tylenol decreased her daily headache pain by 50 percent, but did little, if

anything, for her migraines. (*Id.*)  The results of a neurological examination were

normal. (Tr. 861.)  She weighed 105 pounds. (*Id.*)  Dr. Rubin noted that Plaintiff did not

attend her prescribed chronic pain rehabilitation program due to travel cost and time

involvement. (Tr. 860.)  The doctor indicated that Plaintiff needed to stop her excessive

use of Tylenol and prescribed Lyrica and Maxalt. (Tr. 862.)

On July 2, 2013, Plaintiff presented to the emergency room for vomiting. (Tr.

824.)  M. McMullen, M.D., reported that Plaintiff had been to the emergency room the

night before and was discharged with prescriptions for Biaxin and Phenergan. (*Id.*)

Plaintiff had not filled her prescriptions and had begun vomiting at home. (*Id.*)  Dr.

McMullen observed that Plaintiff was not vomiting and was in not acute medical

distress. (Tr. 824).  He described her as well-nourished and emphasized the

importance of compliance. (*Id.*)

### 2.   Agency Reports

On August 5, 2011, state agency physician Gary Hinzman, M.D., conducted a

review of the record to assess Plaintiff's physical limitations. (Tr. 87-88.)  He opined

8

that Plaintiff could frequently manipulate with her left hand and recommended a number of environmental limitations. (*Id.*). Dr. Hinzman documented that Plaintiff currently weighed 115 pounds, was 64 inches tall, and had a BMI of 19.70. (Tr. 88.) Over the past 12 months, Plaintiff's recorded weight had ranged from 115 to 127 pounds. (*Id.*)

State agency physician Bradley Lewis, M.D., conducted a second review of the record on February 17, 2012. (Tr. 104-06.) He concluded that Plaintiff could lift and carry up to 20 pounds occasionally and ten pounds frequently; stand or walk for a total of five hours per workday; could frequently manipulate with her left hand; and should avoid concentrated exposure to extreme cold and heat, wetness, humidity, fumes, odors, dusts, gases, and poor ventilation. (Tr. 104-05.)

### C. Hearing Testimony

#### 1. Plaintiff's Hearing Testimony

Plaintiff testified that she suffered from migraine headaches approximately two or more times each month. (Tr. 50.) She had been prescribed Lyrica and Maxalt. (*Id.*) Her migraines ranged in duration from a few days to a few weeks. (*Id.*) On days she suffered from a migraine, Plaintiff was "useless." (Tr. 61.) She described Maxalt as very helpful and "the best thing ever" for migraines. (*Id.*) After taking Maxalt, however, Plaintiff needed to lie down because the drug made her "dopey" and "useless." (*Id.*) Plaintiff had stopped taking high dosages of Tylenol, because Lyrica helped with daily headache pain. (Tr. 62.) She was unable to take the full dosage of Lyrica her doctors had prescribed because the drug made her nauseous and increased her grogginess

and fatigue. (*Id.*). Plaintiff was in the process of obtaining an online master's degree in fashion design, but had failed her last semester course work due to a migraine that had lasted two or three weeks and complications with fibromyalgia. (Tr. 63-64.)

As to her digestive problems, Plaintiff explained that she tried to maintain a liquid diet and had been taking anti-nausea medication two to three times daily since 2008. (Tr. 53.)  She still experienced nausea and her medication caused drowsiness, which resulted in her sleeping for up to two hours after taking it. (Tr. 54.) She was not vomiting as often as she had in the past due to successful trial and error with dietary restrictions. (Tr. 62.)

## 2.   Vocational Expert's Hearing Testimony

Barbara Ellen Burk, a vocational expert, testified at Plaintiff's hearing.  The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work experience who would be capable of performing a range of light work that involved only frequent pushing and pulling bilaterally of hand and foot controls; frequent handling and fingering bilaterally; frequent climbing ramps and stairs; occasional climbing of ropes, ladders, and scaffolds; frequent balancing, stooping, kneeling, crouching, and crawling; and occasional exposure to unprotected heights, moving mechanical parts, and operation of motor vehicles. (Tr. 71.)  The individual would need to avoid concentrated exposure to humidity and wetness, extreme temperatures of hot and cold, and pulmonary irritants. (*Id.*)  In terms of mental limitations, the individual must be limited to a low production rate, pace, or quota performed in a static environment with infrequent changes. (Tr. 72.)

10

The VE testified that the hypothetical individual would be capable of performing the Plaintiff's past relevant work as an administrative clerk, cashier, informal waitress, still photographer, and community health educator. (*Id.*)  The VE further testified that the individual would be capable of performing other jobs, such as a housekeeping cleaner, commercial cleaner, and coffee shop attendant. (Tr. 73.)

### III.  STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524 (6th Cir. 1981)*.  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan, 905 F.2d 918, 923 (6th Cir. 1990)*.  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that

11

"significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education, or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on June 30, 2013.

2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of August 26, 2008, through her date last insured of June 30, 2013.

3.    Through the date last insured, the claimant had the following severe impairments: gastritis and history of peptic ulcers; cholecystectomy; history of polysubstance abuse, in partial remission; status post septoplasty (deviated nasal septum); migraine headaches; fibromyalgia with joint and back pain; anxiety disorder, adjustment disorder with depressed mood; personality disorder and posttraumatic stress disorder.

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part

404, Subpart P, Appendix 1.

5.     After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except frequent push/pull with hand and food controls, bilaterally; frequent handling/fingering, bilaterally; frequent climbing of ramps and stairs; occasional exposure to unprotected heights, moving mechanical parts, and operation of a motor vehicle; she must avoid concentrated exposure to humidity, wetness, extreme temperatures of hot and cold, and pulmonary irritants; and she is limited to a low production rate, pace, or quota performed in a static environment with infrequent changes.

6.     Through the date last insured, the claimant was capable of performing past relevant work as a cashier II, informal waitress, administrative clerk, still photographer, and community health educator. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity.

7.     The claimant was not under disability, as defined in the Social Security Act, at any time from August 26, 2008, the alleged onset date, through June 30, 2013, the date last insured.

(Tr. 21-31).

## V.  LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been

cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

> **B.**   **Plaintiff's Assignments of Error**
>
> > **1. The ALJ erred by failing to consider the limitations caused by Plaintiff's migraine headaches and digestive disorders when evaluating Plaintiff's RFC.**

Plaintiff argues that the ALJ did not account for her migraine headaches and digestive disorders when formulating her residual functional capacity (RFC). According to Plaintiff, the ALJ should have included restrictions in the RFC related to these issues.  Notably, Plaintiff does not suggest what, if any, limitations ought to have been incorporated in the RFC.  Plaintiff also contends that the ALJ failed to sufficiently consider all of the evidence pertaining to her headaches and

digestive disorders.   For the reasons set forth below, Plaintiff's argument is not well taken.

The RFC is an indication of a claimant's work-related abilities despite his limitations.  *See* 20 C.F.R. § 404.1545(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 404.1545(e).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 404.1545(a), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.  While the RFC is for the ALJ to determine, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) ("The determination of a claimant's Residual Functional Capacity is a determination based upon the severity of his medical and mental impairments. This determination is usually made at stages one through four [of the sequential process for determining whether a claimant is disabled], when the claimant is proving the extent of his impairments.")

In formulating Plaintiff's RFC, the ALJ engaged in a detailed discussion of Plaintiff's medical history with regard to both her headache and digestive issues. (Tr. 25-28.)  It is well established that an ALJ is required to *consider* all of the evidence in the record, but he is not required to *discuss* each item of evidence in his opinion.  *See, e.g., Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th

15

Cir. 2004) ("An ALJ need not discuss every piece of evidence in the record for his decision to stand.") Here, based on a review of the ALJ's opinion, it is clear that the ALJ sufficiently considered the entire record when evaluating the RFC.  With a considerable level of detail, the ALJ discussed and analyzed numerous treatment sessions, emergency room visits, and diagnostic studies that Plaintiff underwent from 2008 through 2013, which pertained to Plaintiff's headache and digestive problems. (*Id.*)  In the course of this discussion, the ALJ addressed treatment methods and their effectiveness, including medications; physicians' observations; Plaintiff's reports of symptoms; and Plaintiff's noncompliance. (*Id.*)  The ALJ also summarized Plaintiff's testimony, specifically discussing Plaintiff's statements about her medications and the side effects she alleged they caused. (Tr. 24.)

For example, the ALJ explained that despite recurrent emergency department visits with complaints of nausea and vomiting, Plaintiff was consistently discharged home from the emergency room in improved condition after the administration of antiemetics and without the need for more extensive treatment. (Tr. 25.)  Emergency room notes throughout the record reflect this conservative approach, which significantly alleviated Plaintiff's symptoms. (Tr. 271-72, 330-36, 316-17, 540-42, 587, 607-08.)  The ALJ also acknowledged Plaintiff's gallbladder surgery in 2010. (Tr. 25.)  The ALJ assessed that in the years following the surgery, Plaintiff experienced improvement with only medication and attention to her diet. (Tr. 25-27.)  In particular, the ALJ highlighted the following: in May 2012, Dr. Shay observed that Plaintiff had not been to the emergency room for digestive issues in five months (Tr. 27, 766.); a gastric

16

emptying study from May 2012 showed only mild gastropharesis (Tr. 27, 784.);

Dr. Tronetti noted that Plaintiff was stable on Zofran in October 2012 (Tr. 27,

684.); and Plaintiff did not complain of nausea or vomiting to Dr. Tronetti in

January 2013. (Tr. 27, 609.)

As to her headaches, the ALJ noted that a neurological evaluation in May

2012 was unremarkable. (Tr. 27, 774.)  Plaintiff was referred to chronic pain

rehabilitation, but did not attend due to cost of travel and time involvement. (Tr.

28, 860.)   The ALJ further noted that Plaintiff treated with Dr. Rubin in March

2013, and described her headaches as a daily annoying ache. (*Id.*)  Plaintiff also

described a migraine a few months prior that she rated as very severe. (*Id.*)

Despite this complaint, the ALJ observed that Plaintiff did not seek emergency

room treatment, and the only medication Plaintiff took for migraines was extra

strength Tylenol.[1] (*Id.*)

Along with providing a thorough discussion and evaluation of treatment

records, the ALJ accorded great weight to the RFC suggested by the state agency

reviewing physicians and psychologist. (Tr. 29.)  The opinions of state agency

medical consultants regarding the nature and severity of an individual's

impairments constitute expert opinion evidence upon which an ALJ may rely.  *See*

S.S.R. 96-6p, 1996 WL 374180, at *1 (S.S.A.).  Plaintiff does not direct the Court

---

[1]     Plaintiff argues that the ALJ failed to acknowledge the large doses of
Tylenol she took in an attempt to relieve her headaches and migraines.
Although the ALJ did not state the amount of Tylenol Plaintiff alleges she
took, the ALJ acknowledged her use of the drug.  Moreover, Dr. Rubin
told Plaintiff that her excessive use of Tylenol was inappropriate and
prescribed Lyrica and Maxalt instead. (Tr. 862.)

17

to evidence showing that she was functionally more limited than the state agency medical sources or the ALJ ultimately concluded.  Although Plaintiff had diagnoses of gastroparesis and migraine headaches, the "mere diagnosis" of a condition "says nothing" about its severity or its effect on a claimant's ability to perform work.  *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988).   Therefore, the fact that a physician diagnosed these conditions did not alone require the ALJ to include limitations in the RFC.

In addition, the ALJ found that Plaintiff's testimony concerning her limitations was not entirely credible as it was not consistent with the medical evidence detailed in the ALJ's opinion and several facts did not support her subjective allegations.  For example, the ALJ explained:

- Plaintiff had been largely treated in a conservative fashion, despite repeated emergency room visits.  The record failed to show that Plaintiff required hospitalizations, urgent office care, or surgery[2] to treat or manage symptoms associated with her complaints. This evidence shows that Plaintiff's condition would reasonably be expected to produce the symptoms she alleged, but it is not of a disability severity. (Tr. 29.)

- Plaintiff was completing her degree in fashion design, while taking three classes each term, and was able to care for her disabled daughter as well as herself. (Tr. 29, 43, 64.)

- Plaintiff drove herself to the hearing as well as appointments.  She attended church twice per week where she participated in a youth group for her daughter and was joining a women's group. (Tr. 29, 43, 57.)

- Plaintiff could walk a metro park, slept an average of six hours

---

[2]    As previously noted, the ALJ acknowledged Plaintiff's gallbladder removal. (Tr. 25.)  Plaintiff points to no other surgical procedures recommended or performed in order to treat her digestive issues or headaches.

each night, and had good activities of daily living.  She assisted and accompanied her daughter in horse competitions. (Tr. 29, 52, 57-58, 60.)

•    Plaintiff had issues of noncompliance and admitted to smoking marijuana within the past year and continuing to smoke a pack of cigarettes per day, despite a diagnosis of asthma. (Tr. 29, 56.)

The ALJ provided reasonable grounds for discounting Plaintiff's credibility and the accuracy of her statements describing her symptoms and limitations.  Plaintiff does not now challenge the ALJ's credibility determination.  Accordingly, the ALJ was required to incorporate Plaintiff's subjective complaints into the RFC only to the extent that he found them to be credible. See *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007) ("An ALJ is not required to accept a claimant's subjective complaints, and can present a hypothetical to the VE on the basis of his own assessment if he reasonably deems the claimant's testimony to be inaccurate.") (internal quotations and citations omitted).

As the ALJ considered the impact of Plaintiff's migraine headaches and digestive disorders when evaluating Plaintiff's RFC, Plaintiff's first assignment of error does not present a basis for remand.

### 2. The ALJ erred by finding Plaintiff did not meet or medically equal Listing 5.00.

Plaintiff argues that the ALJ erred by failing to provide an appropriate rationale for finding that her impairments did not meet or equal Listing 5.00, the listing for disorders of the digestive system.  Plaintiff points to Listings 5.08 and 5.06, which address the digestive disorders of weight loss and inflammatory bowel disease (IBD).  She argues that the ALJ's rationale with regard to Listing 5.08 is not supported by

substantial evidence. In addition, she maintains that the ALJ's failure to provide any analysis related to Listing 5.06 requires remand for further evaluation.  According to Plaintiff, the ALJ's inadequate Step Three finding was not harmless error, because the evidence of record indicates that her digestive conditions met or medically equaled Listings 5.08 and 5.06. The Commissioner responds that substantial evidence supports the ALJ's finding that Plaintiff did not meet or equal a listed impairment.  For the following reasons, Plaintiff's arguments fail.

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or medically equals one of the impairments in the Listings. *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (citing 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii)).  An ALJ must compare the claimant's medical evidence with the requirements of listed impairments when considering whether the claimant's impairment or combination of impairments is equivalent in severity to any listed impairment. *Id.* at 415; *Hunter v. Astrue*, No. 1:09-cv-2790, 2011 WL 6440762, at *3 (N.D. Ohio Dec. 20, 2011); *May v. Astrue*, No. 4:10-cv-1533, 2011 WL 3490186, at *8-9 (N.D. Ohio June 1, 2011).  Nevertheless, it is the claimant's burden to show that he meets or medically equals[3] an impairment

---

[3]     A claimant may be found disabled if her impairment is the *medical equivalent* of a listing. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). This means that the impairment is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a).  An ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any listed impairment. *Cf. Lawson v. Comm'r Soc. Sec.*, 192 F. App'x 521, 529 (6th Cir. 2006) (upholding ALJ who "compar[ed] the medical evidence of Lawson's impairments with the requirements for listed impairments contained in the

in the Listings. *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987) (per curiam).

Listing 5.08 addresses involuntary weight loss and provides that an individual will qualify for disability when she demonstrates:

> Weight loss due to any digestive disorder despite continuing treatment as prescribed, with BMI of less than 17.50 calculated on at least two evaluations at least 60 days apart within a consecutive 6-month period.

20 C.F.R. Pt. 404, Subpt. 404, App. 1, 5.08.

Listing 5.06, the listing for inflammatory bowel disease, requires in relevant part:

> 5.06 Inflammatory bowel disease (IBD) documented by endoscopy, biopsy, appropriate medically acceptable imaging, or operative findings with:
>
> . . .
>
> B. Two of the following despite continuing treatment as prescribed and occurring within the same consecutive 6-month period:
>
> . . .
>
> 3. Clinically documented tender abdominal mass palpable on physical examination with abdominal pain or cramping that is not completely controlled by prescribed narcotic medication, present on at least two evaluations at least 60 days apart; or
>
> . . .
>
> 5. Involuntary weight loss of at least 10 percent from baseline, as computed in pounds, kilograms, or BMI, present on at least two evaluations at least 60 days apart.

20 C.F.R. Pt. 404, Subpt. 404, App. 1, 5.06.

Here, the ALJ concluded at Step Two of his analysis that Plaintiff's gastritis

SSA regulations").

and history of peptic ulcers were severe impairments. (Tr. 21.)  At Step Three, the ALJ explained that he considered Listing 5.00 in total. (Tr. 22.)  The ALJ more specifically discussed Listing 5.08, and he concluded that Plaintiff did not qualify for disability under the Listing because there was no evidence to support malnutrition or wasting. (*Id.*)

As to Listing 5.08, Plaintiff's argument is not well taken.  Plaintiff contends that the record contains evidence of malnutrition and wasting contrary to the ALJ's finding.  To support this conclusion, she asserts that her low BMI was attributable to gastroparesis, which causes malnutrition and weight loss.  Plaintiff, however, does not point to any report from a medical source indicating that she was malnourished.  Moreover, throughout his opinion, the ALJ documented Plaintiff's fluctuations in weight as reported by her physicians. (Tr. 25-27.)  None of the BMI findings corresponding to the weight measurements the ALJ recounted in his opinion qualify Plaintiff under Listing 5.08.  Rather, evidence supports the ALJ's conclusion that there was insufficient evidence of wasting.  The ALJ noted that on March 1, 2012, Plaintiff weighted 103 pounds. (Tr. 26, 695.)  This is the lowest weight measurement to which Plaintiff cites in her Brief that was the result of a medical evaluation, rather than a self-report from Plaintiff.[4]  Her corresponding BMI on this date was 17.83, a level above the Listing's required BMI of 17.50. (Tr. 695.)

Plaintiff argues that her personal calculation of her BMI resulted in a BMI less

---

[4]    Plaintiff cites to a report that contains a note indicating her weight was down to 100 pounds. (Tr. 249.)  This record of Plaintiff's weight was a report Plaintiff made to a psychologist, not a measurement taken by a healthcare provider.

than 17.50.  In her Brief, however, Plaintiff points to various medical records that contain her height, weight, and BMI, as measured and calculated by medical professionals.  As reflected in these records, Plaintiff's BMI never reached or fell below 17.50.[5]  Accordingly, the ALJ's finding that Plaintiff did not meet or medically equal Listing 5.08 is supported by substantial evidence.

In regard to Listing 5.06, the Listing for IBD, Plaintiff contends that the ALJ erred in failing to provide any analysis of the Listing.  While the ALJ did not expressly discuss Listing 5.06, he considered Listing 5.00 in total. (Tr. 22.)  Moreover, Plaintiff has not established that she could meet all of the specified medical criteria of Listing 5.06.

To begin, Listing 5.06 requires IBD documented by endoscopy, biopsy, appropriate medically acceptable imaging, or operative findings. The ALJ did not find that IBD was an impairment, either severe or non-severe.  Plaintiff points to no evidence of a diagnosis of IBD in the record.  Instead, Plaintiff argues that she suffered from gastritis and irritable bowel syndrome (IBS).  Plaintiff, however, has not shown that IBS and IBD are the same diseases.  In fact, there is authority to the contrary.[6]  Nor has Plaintiff proven that her IBS and gastritis are medically equal to

---

[5]     For example, on page 17 of her Brief Plaintiff cites to the following records which reflect that on March 21, 2012, Plaintiff's BMI was 17.86 at a weight of 104 pounds (Tr. 701.); on May 1, 2012, her BMI was 18.37 at a weight of 107 pounds (Tr. 765.); on July 30, 2012, her BMI was 18.00 at a weight of 105 pounds (Tr. 669.); and on April 25, 2013, her BMI was 18.36 at a weight of 107 pounds. (Tr. 665.)  Healthcare providers consistently reported that Plaintiff was five feet, four inches tall. (*Id.*)

[6]     Irritable bowel syndrome is defined as "a chronic non-inflammatory disease characterized by abdominal pain, altered bowel habits consisting

23

IBD. *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify. . . For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.")

Even if this Court were to assume that Plaintiff met the initial requirement of Listing 5.06, Plaintiff does not point to evidence of a tender abdominal mass present

---

of diarrhea or constipation or both, and no detectable pathologic change." *Physicians' Desk Reference* 1821 (PDR Network, LLC, 64th ed. 2010.)

Gastritis is defined as "inflammation of the stomach." *Id.* at 757.

Inflammatory bowel disease includes, but is not limited to, Crohn's disease and ulcerative colitis. These disorders, while distinct entities, share many clinical, laboratory, and imaging findings, as well as similar treatment regimens. Remissions and exacerbations of variable duration are the hallmark of IBD. Crohn's disease may involve the entire alimentary tract from the mouth to the anus in a segmental, asymmetric fashion. Obstruction, stenosis, fistulization, perineal involvement, and extraintestinal manifestations are common. Crohn's disease is rarely curable and recurrence may be a lifelong problem, even after surgical resection. In contrast, ulcerative colitis only affects the colon. The inflammatory process may be limited to the rectum, extend proximally to include any contiguous segment, or involve the entire colon. Ulcerative colitis may be cured by total colectomy. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 5.00(E).

Symptoms and signs of IBD include diarrhea, fecal incontinence, rectal bleeding, abdominal pain, fatigue, fever, nausea, vomiting, arthralgia, abdominal tenderness, palpable abdominal mass (usually inflamed loops of bowel) and perineal disease. You may also have signs or laboratory findings indicating malnutrition, such as weight loss, edema, anemia, hypoalbuminemia, hypokalemia, hypocalcemia, or hypomagnesemia. *Id.*

on two evaluations within the same six month period.  Any abdominal masses in the records to which Plaintiff cites manifested themselves over one year apart, and thus cannot meet the Listing.[7]  Accordingly, Plaintiff's Brief does not set forth evidence from the record to support her argument that she could qualify for disability under Listing 5.06, and remand for the ALJ to reassess whether Plaintiff meets or medically equals a listing is not warranted.

## VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge


Date: September 16, 2015

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

---

[7]     Two of the records Plaintiff points to in support of Listing 5.06 might arguably show that Plaintiff had an abdominal mass, but nevertheless fail to meet the timing requirements of the Listing. (Plaintiff's Brief at 19.)  On March 8, 2010, an abdominal examination showed a soft abdomen with a palpable liver. (Tr. 268.)  There were no other masses. (*Id.*)  Over one year later, on June 23, 2011, an examination revealed that Plaintiff was "tender over [right lower quadrant of abdomen] and [had a] palpable ileum. . . . No mass felt." (Tr. 378.)  The remaining records Plaintiff cites to in support of showing an abdominal mass do not include this finding. *See*, Tr. 317 (tender abdomen, but no mass); Tr. 376 (no mass felt); Tr. 380 (no mass felt); Tr. 541 (tenderness, but no mass noted); Tr. 608 (no mass noted).